AO 91 (Rev. 11/11) Criminal Complaint

AUSA Yasmin N. Best (312) 469-6024

**FILED**

JUL 08 2016

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JAIME VALDEZ-JACOBO,
RONNIE R. MITCHELL, and
SAMMY R. GORDON

CASE NUMBER:

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**16CR 436**

**MAGISTRATE JUDGE GILBERT**

### AMENDED CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

In the Northern District of Illinois, Eastern Division, and elsewhere, the defendants committed the following violations:

#### Count One

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | On or about July 7, 2016, in Hoffman Estates, in the Northern District of Illinois, JAIME VALDEZ-JACOBO, did knowingly and intentionally distribute a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance. |

#### Count Two

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | On or about July 7, 2016, in Hoffman Estates, in the Northern District of Illinois, RONNIE R. MITCHELL and SAMMY R. GORDON did knowingly possess with the intent to distribute a controlled substance, namely, approximately 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance. |

This criminal complaint is based upon these facts:

    X   Continued on the attached sheet.

ERIK COLLINS
Special Agent, Drug Enforcement Administration

Sworn to before me and signed in my presence.

Date: July 8, 2016

*Judge's signature*

City and state: Chicago, Illinois

JEFFREY T. GILBERT, U.S. Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

ss

### AFFIDAVIT

I, ERIK COLLINS, being duly sworn, state as follows:

## I.   INTRODUCTION

1.    I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since approximately September 2013. I am currently assigned to the DEA Chicago Field Division. As such, I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.    Since becoming a Special Agent with DEA, my responsibilities include the investigation of narcotics trafficking offenses, including, but not limited to, violations of Title 21, United States Code, Sections 841, 843, and 846. I have been involved in various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances. Some of the specialized training I have received includes, but is not limited to, classroom instruction concerning narcotics smuggling, money laundering, and conducting conspiracy and complex investigations. I have conducted and participated in investigations that have resulted in the seizure of controlled

substances. I am familiar with, and have participated in all of the normal methods of investigation, including but not limited to, visual surveillance, questioning of witnesses, the use of search and arrest warrants, the use of consensually recorded calls, text messages and meetings, the management and use of informants, and pen registers.

3.      Through these investigations, my training and experience, and conversations with other law enforcement officers, I have become familiar with the methods used by narcotics traffickers to distribute, transport, store, and import controlled substances. I have also had experience with multiple consensually monitored telephone calls with cooperating defendants, informants, and subjects of investigations.

4.      Because this Affidavit is for the limited purpose of establishing probable cause to support the criminal complaint and the issuance of arrest warrants against the proposed defendants, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and events described in this Affidavit.

5.      The statements contained in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided by other federal and local law enforcement officers ("LEOs"); (c) laboratory analysis reports; (d) surveillance reports; (e) criminal history records; (f) information from cooperating sources; and (g) my training and experience and the training and experience of other law enforcement agents.

## II.    PROBABLE CAUSE

### A.    Background

6.    Since approximately June 2016, the DEA has been conducting an investigation into allegations that Jaime VALDEZ-JACOBO ("VALDEZ-JACOBO") is engaged in an ongoing narcotics distribution conspiracy in the Chicago area and elsewhere. In June 2016, a cooperating defendant (the "CD") working with law enforcement provided information regarding the historical narcotics trafficking activities of VALDEZ-JACOBO and others in and around the Chicago area. Based on information provided by the CD and corroborated by information obtained from law enforcement databases, agents initiated an investigation of VALDEZ-JACOBO. As described in more detail below, on July 7, 2016, law enforcement was conducting surveillance of VALDEZ-JACOBO in the Aurora, Illinois area. As a result of this surveillance, law enforcement seized approximately 577 grams of heroin distributed by VALDEZ-JACOBO to Ronnie R. MITCHELL and Sammy R. GORDON.

### B.    Historical Information Obtained from the CD

7.    The CD is providing information in this investigation in exchange for consideration regarding narcotics charges arising from events that occurred in 2015. The CD's criminal history includes convictions for narcotics trafficking and immigration offenses. Since beginning to cooperate with law enforcement, the CD has provided reliable and corroborated information to law enforcement in this investigation. The information provided by the CD has been corroborated by physical surveillance, investigative databases and information from other law

3

enforcement officers. Based on law enforcement dealings with the CD and the information provided in this Affidavit, I consider the CD to be credible and believe that the information provided by CD is reliable.

8. According to the CD, the CD has obtained approximately 6 kilograms of heroin from a person he knows as "Paisa," over the course of the last year, most recently in approximately April 2016. The CD described Paisa as a Hispanic man approximately 30 years of age who has a short haircut. The CD stated that Paisa typically charges $50,000 to $53,000 per kilogram. The CD stated that Paisa told the CD that Paisa and/or other people working with Paisa, including Paisa's brother, transport approximately 5 kilograms of heroin at a time concealed in working car batteries or other car traps from the Houston, Texas area. According to the CD, Paisa typically receives loads of heroin delivered to the greater Chicago area every couple of weeks. According to the CD, Paisa's brother typically transports heroin at Paisa's direction from Houston and in the greater Chicago area. The CD also provided agents with two telephone numbers for Paisa, including (331) 229-1683. The CD also informed agents that Paisa also works as a roofer and drives a white construction pickup truck.

9. The CD also stated that he was planning to register a truck in Paisa's brother's name. As a result, the CD received a copy of Paisa's brother's Mexican consular identification. That identification contained an address on 400 block of South Lasalle Street in Aurora (the "Lasalle Street residence").

10.     The CD also accompanied law enforcement to a residence, located on the 100 block of North Calhoun Street in Aurora, Illinois ("the Calhoun Street residence"), where the CD stated that he/she typically met Paisa in the past to obtain heroin and make payments for heroin. According to the CD, such transactions typically took place in the driveway of this residence.[1]

**C.     July 7, 2016 Seizure of approximately 577 Grams Heroin**

11.     On July 7, 2016, as part of this investigation, law enforcement began conducting surveillance of the Lasalle Street and Calhoun Street residences. At approximately 8:51 a.m., as surveillance was arriving in the vicinity of the Lasalle Street residence, agents observed an individual later identified as VALDEZ-JACOBO[2] departing in a white Chevy work pickup truck, bearing Illinois license plate 1787733 and registered to another person ("Individual A") at the Lasalle Street residence. Mobile surveillance was initiated, and agents observed VALDEZ-JACOBO running errands and working (including performing roofing work), until mobile surveillance of VALDEZ-JACOBO was terminated at approximately 11:00 a.m.

12.     At approximately 3:10 p.m., agents conducting surveillance of the Calhoun Street residence observed VALDEZ-JACOBO, driving the white Chevy work pickup truck, arrive at the Calhoun Street residence. Surveillance observed VALDEZ-JACOBO exit the Chevy truck and enter the residence.

---

[1] A review of law enforcement databases regarding narcotics also indicated the Calhoun Street residence as being associated with VALDEZ-JACOBO.

[2] VALDEZ-JACOBO was identified after his arrest, described in more detail below, based on his presentation of identification to arresting agents.

13.     At approximately 3:14 p.m., surveillance observed VALDEZ-JACOBO exit the residence, enter the Chevy truck, and depart the area. Mobile surveillance was maintained on VALDEZ-JACOBO until he arrived at a shopping plaza, located near the intersection of North Salem Drive and West Golf Road in Schaumburg, Illinois. Surveillance then observed VALDEZ-JACOBO enter El Mercadito store, located at 1053 North Salem Drive in Schaumburg.

14.     At approximately 4:12 p.m., surveillance observed VALDEZ-JACOBO exit El Mercadito with a drink and ice cream in his hands, enter the Chevy truck, and drive the Chevy truck to a different location in the same lot.

15.     At approximately 4:27 p.m., surveillance observed a grey Ford F150 truck, bearing Illinois license plate 195891 and being driven by an individual subsequently identified as GORDON, and a gold Volvo SUV, bearing Illinois license plate Q142242 and being driven by an individual subsequently identified as MITCHELL, enter the lot and drive towards VALDEZ-JACOBO. At the same time, surveillance observed VALDEZ-JACOBO, driving the Chevy truck, beginning to exit the parking lot. VALDEZ-JACOBO was followed by GORDON and MITCHELL in their respective vehicles. Surveillance observed VALDEZ-JACOBO proceed to a nearby large apartment complex on the west side of the 700 block of North Salem in Hoffman Estates, where he parked.

16.     Mobile surveillance observed the grey Ford F150 and gold Volvo SUV proceeding to a parking lot of a business complex near the 900 block of Bode Road in Schaumburg, which was across the street from where VALDEZ-JACOBO was

parked. At approximately 4:30 p.m., surveillance observed GORDON park the grey Ford F150, exit the vehicle carrying a large, white paper shopping bag and enter the passenger seat of the gold Volvo SUV. Surveillance then observed the gold Volvo SUV, then occupied by MITCHELL and GORDON, drive across the street to meet VALDEZ-JACOBO.

17.     At approximately 4:32 p.m., surveillance observed VALDEZ-JACOBO, GORDON and MITCHELL meet near the apartment complex parking lot. From his vehicle, VALDEZ-JACOBO spoke to GORDON and MITCHELL, who were in the Volvo SUV, before leading them to a parking lot of an apartment complex located on the 600 block of North Salem Drive in Hoffman Estates, Illinois. Once there, VALDEZ-JACOBO, GORDON, and MITCHELL each exited their vehicles, talked briefly, and entered the apartment complex. GORDON was carrying the aforementioned white paper shopping bag as he entered.

18.     At approximately 4:41 p.m., surveillance observed MITCHELL and GORDON exit the apartment complex. GORDON was again carrying the white paper shopping bag. MITCHELL and GORDON entered the gold Volvo SUV and departed the area. Mobile surveillance was maintained as MITCHELL and GORDON left the area.

### D.     Arrests of MITCHELL and GORDON and Their Post-Arrest Interviews

19.     At approximately 4:45 p.m., surveillance observed MITCHELL and GORDON arrive at the parking lot where the grey Ford F150 was parked in

Schaumburg. At this time, agents approached MITCHELL and GORDON. Upon approach, agents observed through the window the white paper shopping bag on the rear passenger side floorboard of the Volvo. Through the window, agents could see the white paper shopping bag was open, and observed what they believed to be approximately a half-kilogram brick of what they believed to be narcotics at the bottom of the bag.

20.    Agents identified themselves for MITCHELL and GORDON, conducted protective pat-downs, and asked for identification from both. Both MITCHELL and GORDON provided their driver's licenses to agents. Agents asked MITCHELL, who was the driver of the Volvo SUV, for consent to search the Volvo, and MITCHELL provided verbal consent to search the vehicle. Agents observed and removed a white shopping bag, containing a brick-shaped package of clear plastic wrapped in black electric tape. The package weighed approximately 577 grams of white powdery substance, the contents of which field tested positive for the presence of heroin.

21.    During an on-scene interview, before he was given his *Miranda* warnings, MITCHELL stated that he had traveled with GORDON to the apartment on North Salem Drive but had remained in the hallway and didn't see what occurred there.

22.    While GORDON was in custody but before he was given his *Miranda* warnings, at approximately 6:12 p.m., agents transported to the apartment complex located on the 600 block of North Salem Drive, where agents asked GORDON to identify the unit in which he had received the heroin. GORDON pointed out

apartment 108 inside the apartment complex as the apartment where the heroin transaction took place. GORDON also stated that he had seen another half-kilogram of heroin in the apartment.

23.    GORDON was subsequently transported to the Hoffman Estates police department, where he was read his *Miranda* warnings and provided with a written Miranda form. GORDON verbally acknowledged that he understood his rights, read the form and signed the waiver of his rights, and agreed to talk to agents.

24.    During the post-arrest interview, GORDON stated that MITCHELL organized the heroin transaction by telephone with the person GORDON and MITCHELL had met earlier that day. GORDON stated that he did not have a telephone number for the heroin supplier, whose name he did not know. According to GORDON, once he and MITCHELL arrived at apartment 108, GORDON, MITCHELL, and the heroin supplier entered the apartment. GORDON stated once inside the apartment, GORDON handed over the white paper shopping bag containing approximately $28,000 to the heroin supplier, who then went to a bedroom. According to GORDON, a short time later, the heroin supplier exited the bedroom and handed back the white paper shopping bag, now containing what GORDON believed to be approximately 500 grams of heroin, to GORDON. GORDON then exited the apartment and returned to the Volvo SUV with MITCHELL. GORDON also stated that contrary to his previous statement, he did not observe another half-kilogram of heroin in apartment 108. During the post-arrest interview, GORDON identified a photograph of VALDEZ-JACOBO, taken by

agents on July 7, 2016, as the person who distributed the heroin to him earlier that day.

25.    MITCHELL was also transported to the Hoffman Estates police department, where he was read his *Miranda* warnings and provided with a written Miranda form. MITCHELL verbally acknowledged that he understood his rights, read the form and signed the waiver of his rights, and agreed to talk to agents. During his post-arrest interview, MITCHELL stated that he was paid $1000 to introduce GORDON to a heroin supplier he addressed only as "Friend." MITCHELL provided agents with consent to search his telephone, and identified telephone number (630) 453-4650, listed in his recent call logs, as the number for the heroin supplier. MITCHELL also admitted that, contrary to his prior statement, he entered the apartment with GORDON and the heroin supplier to complete the transaction. MITCHELL also stated he bought a half-kilogram of heroin from the same heroin supplier earlier in 2016. During the post-arrest interview, MITCHELL identified a photograph of VALDEZ-JACOBO, taken by agents on July 7, 2016, as the person who distributed the heroin to him earlier that day and from whom he previously purchased heroin.

### E.   Arrest of VALDEZ-JACOBO and His Post-Arrest Interview

26.   At approximately 6:38 p.m., surveillance observed VALDEZ-JACOBO exit apartment 108 and lock the door. Agents observed VALDEZ-JACOBO carrying a plastic shopping bag with a large amount of U.S. Currency visible through the bag. Agents approached VALDEZ-JACOBO as he finished locking the door and asked him about the contents of the bag. VALDEZ-JACOBO admitted the bag contained money. Agents then asked VALDEZ-JACOBO for consent to apartment 108; VALDEZ-JACOBO verbally consented and signed a written consent form. VALDEZ-JACOB was then arrested and read his *Miranda* warnings, and VALDEZ-JACOBO verbally stated he understood and agreed to speak to agents.

27.   Agents conducted a protective sweep of apartment 108. After determining that no one else was present in the apartment at that time, agents also provided VALDEZ-JACOBO with a written Miranda form. VALDEZ-JACOBO read the form and signed the waiver of his rights, and agents conducted a preliminary interview of him in apartment 108.

28.   During the post-arrest interview, VALDEZ-JACOBO stated he lived at this apartment with his cousin, who he identified as Individual B, and some other men. VALDEZ-JACOBO admitted to receiving the U.S. currency in his possession from an unknown black man earlier that day, but denied distributing any narcotics to the unknown man. VALDEZ-JACOBO stated he was picking up the money for a man he knows only as "Chelo," who lives in Mexico City. VALDEZ-JACOBO stated that according to the instructions he received, he was to wait for a call for further

instructions on what to do with the U.S. Currency, but anticipated giving it to an unknown individual at a later time. VALDEZ-JACOBO stated he has done this a couple of times in the past.

29. During the post-arrest interview, VALDEZ-JACOBO also consented to the search of two telephones in his possession. During the search, agents determined that the telephone number for VALDEZ-JACOBO's iPhone is (331) 229-1683, which matched the telephone number provided by the CD in June 2016. Agents determined that the telephone number for VALDEZ-JACOBO's AT&T flip phone is (630) 453-4650, which matched a telephone number recovered from MITCHELL's telephone call log after MITCHELL consented to the search of a phone recovered from him during the course of his arrest.

30. During the consent search of the apartment, agents located a playing card box inside of the pocket of a jacket hanging in a bedroom closet. The playing card box contained a plastic baggie containing approximately 9.9 grams of white powdery substance which field tested positive for cocaine. During his post-arrest interview, VALDEZ-JACOBO stated this was his cocaine for personal use.

## III. CONCLUSION

31. Based on the foregoing, I believe there is probable cause to believe that:

a. On or about July 7, 2016, in Hoffman Estates, in the Northern District of Illinois, JAIME VALDEZ-JACOBO, did knowingly and intentionally distribute a controlled substance, namely, 100 grams or more of a mixture and substance

containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1); and

b.     On or about July 7, 2016, in Hoffman Estates, in the Northern District of Illinois, RONNIE R. MITCHELL and SAMMY R. GORDON did knowingly possess with the intent to distribute a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

ERIK COLLINS
Special Agent, Drug Enforcement Administration

SUBSCRIBED AND SWORN to before me on July 8, 2016.

JEFFREY T. GILBERT
United States Magistrate Judge